## Low Estate

*George J. Vanderslice*, for executor.
*Smith & Eves*, for devisees and legatees.
*Nicholas B. Piazza*, for Commonwealth.

KREISHER, P. J., November 15, 1957.—O. Zerbin Low, of Orangeville Borough, this county, died testate on January 23, 1955. By his will dated February 8, 1954, which was probated February 2, 1955, he disinherited his feeble-minded daughter, Julia, who is presently, and who has been an inmate of the Pennhurst State School since October 2, 1920.

On April 17, 1957, the duly appointed corporate executor filed a first and partial account setting forth debits in the amount of $49,396.86 and credits in the amount of $6,511.69, showing an unliquidated balance of $42,885.17.

Said accountant requested the appointment of an auditor by the court to pass upon a claim of the Commonwealth of Pennsylvania in the amount of

$6,686.96 for the balance due on account of the costs of maintenance to the date of testator's death of the said daughter in said State school.

On August 12, 1957, the auditor filed his report disallowing the claim.

The Commonwealth filed exceptions to this finding and the matter is now before the court for disposition.

On September 12, 1920, the said O. Zerbin Low presented his petition to the court of quarter sessions, this county, for the commitment of his said daughter, aged six, to the Eastern Pennsylvania State Institution for the Feeble-Minded and Epileptic. Said petition provides, inter alia, as follows:

"That the said Julia V. Low has no estate whatsoever, and your petitioner, O. Z. Low, the father of said child, does not have sufficient estate to pay all the cost of maintaining the said Julia V. Low at said institution; but that your petitioner can pay Ten ($10.00) Dollars per month toward her maintenance there, and can pay the expense of her removal and the costs of these proceedings.

"Therefore, your petitioner prays that the said Julia V. Low be committed to the Eastern Pennsylvania State Institution for the Feeble-Minded and Epileptic, and that she be removed there, and that the cost of maintenance at said institution be paid as follows:

"Ten Dollars per month by O. Z. Low, your petitioner, balance of said cost of maintenance to be paid by the Commonwealth as provided in the Act of June 12, 1913, P.L. 494, and that the Court will appoint a day for hearing on this petition."

On October 2, 1920, which was the date fixed by the court for hearing on said petition, the court entered the following order:

"This case having come on to be heard and it appearing to the Court that ten (10) days notice has been

given to the Attorney General of the Commonwealth of Pennsylvania and to the County Commissioners of Columbia County of this hearing, and it further appearing to the Court that said Julia V. Low is feeble-minded and a proper person for admission to the Eastern Pennsylvania State Institution for the Feeble-Minded and Epileptic, and that neither the said Julia V. Low, or her father, O. Z. Low, have estate sufficient to pay for the whole or total maintenance of the said Julia V. Low in the said institution; it is hereby ordered and directed that the said Julia V. Low be admitted to the said Eastern Pennsylvania State Institution for the Feeble-Minded and Epileptic and that she be removed thereto by said O. Z. Low and Mrs. O. Z. Low, at the expense of the said O. Z. Low; and that said O. Z. Low pay Ten ($10.00) Dollars per month toward the cost of her maintenance at the Eastern Pennsylvania State Institution for the Feeble-Minded and Epileptic, and the balance of said maintenance to be at the cost of the Commonwealth of Pennsylvania."

The foregoing order of court was complied with and the father made the payments ordered therein until February 7, 1952, at which time he executed a trust agreement with a corporate trustee setting up a fund of $3,000 cash with directions to the trustee to invest the same and to pay from the income therefrom, $15 per month to the Commonwealth of Pennsylvania for his daughter's maintenance at said school. This voluntary increase in the said court order continued with the Commonwealth's approval until July 14, 1954, at which time the said father increased the corpus of the trust to $4,000 together with directions to the trustee to pay thereafter beginning August 1, 1954, the sum of $30 per month to the Commonwealth of Pennsylvania on account of his daughter's maintenance at said school.

On the same date counsel for the father sent the following letter to the revenue agent at the said school:

"Upon receipt of your letter of July 7th in reply to mine of the first instant, I called in Mr. O. Z. Low, the father. After going over the matter at some length, we both feel that he, and his estate after his death, can pay, beginning with the month of August, 1954, Thirty ($30.00) Dollars a month toward the cost of maintaining Julia. In this connection, you doubtless know that Mr. Low, as Julia's guardian, paid to the Commonwealth of Pennsylvania, toward Julia's maintenance Nine Hundred Seventy-Four Dollars and Forty-Four ($974.44) Cents received by him from the estate of Charles Spencer Low, deceased.

"I hereby submit Mr. Low's offer to pay monthly, so long as Julia remains in your institution, the sum of Thirty ($30.00) Dollars per month, in lieu of the Ten ($10.00) Dollar payment required by existing Court Order. If you accept this offer, kindly so indicate at your early convenience, to the end that the August payment may be in the correct amount."

Under date of July 15, 1954, the said revenue agent at the said school sent the following letter to counsel for the father:

"Your letter of July 14th received and we will start to bill Mr. Low at the rate of Thirty ($30.00) Dollars a month as of August 1st."

We here note in passing that an examination of the bills submitted by the Commonwealth for the daughter's maintenance from October 15, 1920, to January 23, 1955, reflects the effect of inflation over the years and that the original order under the circumstances was quite substantial at the time it was entered.

The Commonwealth's total claim for the first year's maintenance after the first seven months was only

$275 or less than $.90 per day. The order of court provided that $120 of this amount be paid by the father, leaving only $155 to be paid by the Commonwealth for a whole year's maintenance.

On the other hand, the cost of maintenance for the year from June 1, 1953, to May 31, 1954, is $748.42. The order of court plus the voluntary contribution of $5 amounts to $180, leaving a balance of $568.42 to be paid by the Commonwealth for a full year's maintenance.

The total maintenance charged from the date of commitment to the date of the father's death is stated as $12,279.80. The following credits are noted: Paid by Columbia County, $258.40; paid by O. Z. Low, $4,434.44; paid for which no records can be found, $900; balance due, $6,686.96.

It appears from the testimony taken before the auditor and from the letter above quoted that the $900 item was paid to the Commonwealth of Pensylvania by reason of an inheritance the daughter received from her brother's estate. The brother died intestate and her share amounted to $1,254.41. After costs of administration, there remained $974.44 which was paid to the Commonwealth of Pennsylvania by the father who acted in the capacity of guardian for his daughter. It therefore follows that an additional credit of $74.44 is in order which would reduce the claim of the Commonwealth to $6,612.52.

The auditor held that the Commonwealth could not recover because the order of court dated October 2, 1920, definitely fixed the father's liability, and since the Commonwealth failed during the period of inflation to seek an increase, they slept on their rights and cannot now assert them in orphan's court against the father's estate.

Counsel for the executor and counsel for the residuary legatees under the will argue that the order of

court dated October 2, 1920, definitely fixed the father's liability by ordering him to pay $10 per month and since he complied with this order, there is now no outstanding or unfulfilled obligation which the Commonwealth might now properly assert against the estate.

Furthermore, they contend the order of court also fixed the liability of the Commonwealth in accordance with the act of assembly by directing the Commonwealth to pay the balance of the said costs of maintenance.

They also argue that since the father voluntarily set up the said trust fund for future maintenance, giving thereby a present estate in the inmate, that the Commonwealth is precluded from recovering the unpaid past maintenance from the father's estate.

In support of these contentions, counsel for the executor and residuary legatees cite the case of Commonwealth v. Weber, 71 D. & C. 546, 550, wherein it is stated by our esteemed and learned friend, former President Judge Harold G. Knight, of Montgomery County, as follows:

"It is to be presumed that the court, in making the order of September 26, 1947, took into consideration defendant's ability to pay and fixed the amount of the order at $30 per month. If the Commonwealth thought that defendant should pay the full cost of maintenance, it was its duty to seek an amendment to the order, and show the ability of defendant to pay more than $30 per month. We hold then that defendant was not required to pay more than $30 per month from the date of the order until his wife left the hospital."

An examination of this case reveals that it is a petition for attachment against a living relative, who by the act of assembly, is made liable for the inmate's maintenance.

The case does not decide that the relative is not liable to the Commonwealth for the balance due of the inmate's maintenance, but merely determines that a petition for attachment, since the relative complied with the order of court, is not the proper procedure to be used by the Commonwealth to recover the balance due because the court very aptly states in the last sentence of the opinion, on page 552, that:

"The Commonwealth still has its action in assumpsit against the defendant."

Furthermore, the Weber case, being a claim against a living relative, also includes the additional questions under the act of assembly of defendant's ability to pay, while on the other hand, all of the cases examined state that a claim against the estate of a deceased relative eliminates the questions of ability to pay and therefore need not be considered.

The Commonwealth bases its claim on the various acts of assembly making the property or the estate of certain relatives liable for the maintenance of a patient in a State institution. We, therefore, must look to these statutory provisions in light of the foregoing facts.

The said Act of Assembly of June 12, 1913, P. L. 494, which was used as the basis for the commitment and order of court dated October 2, 1920, reads in part as follows:

"At the said hearing the said court or judge shall inquire as to the estate of such idiotic, feeble-minded, or epileptic person, and, if the same be sufficient for the purpose, shall make an order directing the payment therefrom of the cost of maintaining such person in said institution; otherwise, that such payment be made by the husband or parent of such idiotic, feeble-minded, or epileptic person, if it appear that the circumstances of said husband or parent are such as to make such an order proper and advisable, and any such order

shall be enforceable in the same manner in which orders in desertion cases are now enforceable by law. . . . Where the estate of said idiotic, feeble-minded, or epileptic person is insufficient, and the circumstances of her husband or his or her parent are not such as to warrant an order for maintenance on either of them, the said idiotic, feeble-minded, or epileptic person shall be maintained and cared for in the said institution at the cost of the Commonwealth."

The foregoing section of the Act of 1913 was repealed by The Mental Health Act of July 11, 1923, P. L. 998, which was in turn repealed by The Mental Health Act of June 12, 1951, P. L. 533, as last amended by the Act of March 15, 1956, P. L. 1291, sec. I, 50 PS §1361.

Section 309 of The Mental Health Act of 1923 providing for the admission of mental defectives under 20 years of age to State institutions provided that the managers or superintendent of the institution in which the minor defective was admitted: "shall fix the amount, if any, which shall be paid for such support according to the ability of such parents or parent of the person, or according to the value of such person's estate, if any, and shall require payment for such support, so far as there may be ability to pay, as a condition to the admission or retention of said person. Said amount may at any time be changed by said managers or superintendent upon receiving further information concerning such means of support."

There is a further provision that where there is insufficient means to defray the expense in whole or in part by either the person or his parents, the Directors of the Poor, endorsing such application for admission, shall contribute thereto, and all other support shall be provided for by annual appropriations at such per capita rates as shall be appropriated by the General Assembly.

Section 501 of the Act of 1923 provided:

"Such costs shall be chargeable to the estate of such patient, or to the person liable for his support: Provided, That if such estate or person is unable to pay the same, the county or poor district liable for the support of such patient shall be liable for such costs.

"If the patient is committed by order of court, the court or judge shall determine, at the time of commitment, the liability for such costs, and shall assess the same as shall seem to him just and proper."

The Mental Health Act of 1951, repealing the above quoted sections of the Act of 1923, provided simply that the costs for the care and maintenance of any patient in any State institution be imposed according to the order set forth in the act, and the last amendment of March 15, 1956, P. L. (1955) 1291, 50 PS §1361, reenacted the order of liability as set forth in the Act of 1951 and provides as follows:

"Liability for costs of care of patient.—

"Except as otherwise specifically provided in this act, liability for all costs of care of any patient in any State institution is hereby imposed, in the following order, against—

"(1) The patient's real and personal property;

"(2) The persons liable for the patient's support;

"(3) The Commonwealth or, in the case of an inebriate, the county or institution district in which he resides.

"(b) Liability for costs of care of patients committed upon order of the court to any institution, or to any institution district, or to the Department of Public Welfare of cities of the first class for placement in any institution, shall be imposed from the date of the court order as provided in paragraph (a)."

Section I of the Act of June 1, 1915, P. L. 661, 71 PS §1781, sets forth the common law liability of any

inmate of a State institution in the event they have sufficient funds to pay the same.

Section III of said act, 71 PS §1783, provides, inter alia, as follows:

"Liability of relatives and estates by entireties

"The husband, wife, father, mother, child, or children of any person who is an inmate of any asylum, hospital, home, or other institution, maintained in whole or in part by the Commonwealth of Pennsylvania, and who is legally able so to do, shall be liable to pay for the maintenance of any such person, as hereinafter provided. . . ."

Section IV of the said act provides that the court of common pleas of the county of residence of the inmate shall have the jurisdiction to make an order for the payment of maintenance to the Commonwealth upon any person or persons legally liable therefor.

There is no doubt that the orphans' court has jurisdiction of the matter presently before the court: Stoner Estate, 358 Pa. 252.

Unquestionably, had no previous order of court been imposed in the case, the estate of testator would be liable for the Commonwealth's claim: Harnish's Estate, 268 Pa. 128.

The claim of the Commonwealth is not barred by the statute of limitations even though it covers a period of time considerably in excess of six years; Erny's Estate, 337 Pa. 542.

There is a specific provision in The Mental Health Act of 1951 that the Act of 1915 is repealed by The Mental Health Act only "insofar as inconsistent with the provisions of" the latter act. Obviously, both acts of assembly were enacted for the benefit of the Commonwealth empowering it to collect for maintenance costs from both the inmate and/or from those persons

who under our laws are legally liable for the patient's support.

Both of the above quoted acts of assembly make the father liable for the support of his child and it is therefore obvious that there is no inconsistency between the two acts upon the question of the right of the Commonwealth to collect from a father for a child's maintenance and therefor it would appear that both acts of assembly are in full force and virtue.

The only inconsistency between the two acts is that The Mental Health Act sets forth the order of priority of liability, namely, that the estate of the inmate is first and that the other relatives, such as the father, are second. Under both acts the liability of the Commonwealth is last and therefore, as between the Commonwealth and the other person's liability, there is no inconsistency, and as between the Commonwealth and other persons' liability, the order of priority between other persons is unimportant.

In the present case the inmate, Julia V. Low, has no estate of her own except for the above mentioned trust agreement which provides only for a monthly income in the future during her lifetime with the corpus being made payable at the date of her death to certain relatives of settlor.

Counsel for the estate contend that since an order of court was made at the time of the inmate's commitment imposing a certain liability upon testator and since the Commonwealth made no attempt during the lifetime of testator to obtain an increase in the monthly payments, the Commonwealth is now barred from recovering the balance due on account of past maintenance.

We are of the opinion that this argument is without merit because it has been held that the court of common pleas, under section IV of the Act of 1915, may not make an order for past maintenance against a living

relative but that the action must be brought in assumpsit. See Commonwealth v. Weber, supra, and Commonwealth v. Groller, 41 D. & C. 366. Where, however, the relative is dead, and the Commonwealth files its claim in the orphans' court against the relative's estate, it is held the State can recover for the past unpaid maintenance if the estate has sufficient assets: McIlwain Estate, 4 Fiduc. Rep. 200.

It therefore follows that even though the Commonwealth should have, during the inflationary war years, come into the court of common pleas under the Act of 1915, while testator was still living and insisted upon an increase in the original order, and even admitting the fact that the court would have been inclined to increase the order, this order would have been effective only with respect to the future payments and would not have been made retroactive for past maintenance. The estate of testator would, in our opinion, under the cases examined, still have been liable for the unpaid past maintenance which accrued betwen the time of the original order and the date of the application for increase.

Therefore, since the Commonwealth chose to defer its action until the death of testator, we are of the opinion that the statutory liability still prevails and was not abrogated by the making of the original order of court which, incidentally, was a quarter sessions order and not an order in common pleas under the Act of 1915.

In Brubaker Estate, 346 Pa. 339, the child patient was committed to the Danville State Hospital upon an order of court made January 5, 1931, by the Court of Quarter Sessions of Lycoming County, which order placed the costs of maintenance upon the county. The order was never revised or challenged and the Commonwealth never instituted any proceedings under the 1915 Act which is analogous to the case at bar.

Upon the audit of the parents' estate, the Commonwealth made a claim under the Act of 1915 for past maintenance which the Orphans' Court of Lycoming County dismissed.

On appeal by the Commonwealth, the Supreme Court reversed the lower court, stating, on pages 340-41 of the opinion, as follows:

"The Act of June 1, 1915, P. L. 661, imposes liability for the support of an indigent, insane child, in the interest of the Commonwealth, on, inter alia, its parent. The fact that there has been no effort to enforce this liability during the lifetime of the parent does not bar the enforcement of such liability by appropriate proceedings against the parent's estate: Harnish's Estate, 268 Pa. 128. The subsequent Act of July 11, 1923, P. L. 998, known as The Mental Health Act, does not take away this right of the Commonwealth to present claims for expenses incurred in the maintenance of indigent, insane persons against their parents' estate even though no effort to enforce such claims was made during the latters' lifetime."

The liability of a father for the maintenance of his child in a State institution is purely statutory and many of the cases state that the statute was intended by the legislature to favor the Commonwealth and to create an additional source for the recovery of the maintenance and that the father's liability is in the nature of suretyship and independent of any other source of revenue: Boles' Estate, 316 Pa. 179.

Some cases impose liability even though other prior sources are available on the doctrine of subrogation. They hold the right of the Commonwealth to recover is absolute and unconcerned with the order of priority which is a matter to be determined solely between the legally responsible relatives.

The argument of the estate that the Commonwealth has the duty to come into common pleas court under the

Act of 1915 during the lifetime of the parent and demand more support when it appears that the parent is able to pay more because of inflation or other changes in the parent's financial condition, and then if the State fails to make this move, that it is barred from recovery, in our opinion, creates an absurd burden upon the Commonwealth, as well as causing the courts considerable increased burden, because under those circumstances, it would be necessary for the court to inquire into the ability of the parent to pay at the time of hearing.

In the unreported adjudication by Sinkler, P. J., in the Estate of Belinda Joyce, in the Orphans' Court of Philadelphia County, No. 1613 of 1949, it is stated:

"Were the decedent alive, ability to pay would be a condition to the recovery on the maintenance claim, because otherwise the government, by recovering for the maintenance of one person would pauperize the other and ultimately place upon the community or the government the burden of maintaining that other person. When the person sought to be charged has died, there is no longer the danger of his pauperization; it is merely a question of the liquidation of his estate.

"As an abstract proposition, it may be contended, since recovery against a living person is conditioned upon being financially able to pay, that there is no 'cause of action' against a living person if he is not able to pay, and therefore, there is no 'cause of action' which can survive against his estate. The interpretation here followed is that the statute creates a cause of action for maintenance, but that, with respect to a living person, it attaches a condition that the cause of action cannot be enforced unless the person is able to pay.

"This condition is not applicable to a suit against a decedent's estate. Accordingly, the cause of action may

be asserted against the decedent's estate without regard to its financial ability to pay."

Again, on page 10 of the opinion, the auditing judge quotes with approval the following language from Commonwealth v. Groller, supra:

"Since the Commonwealth's claim is now deferred to all others, it follows that payment under the Act of 1915 in the Orphans' Court cannot interfere with decedent, who is, of course, dead, nor with his creditors, who are all preferred, and that the only persons affected are the heirs. They are volunteers and are not to be given a preference in an estate so long as any obligations of the ancestor are unfulfilled, although even they can insist upon enforcement of the indigent person's primary liability, even to the prejudice of the state's claim for future maintenance: Boles' Estate, supra."

The Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, sec. 52, subsec. (5), 46 PS §552, provides:

"(5) That the Legislature intends to favor the public interest as against any private.interest."

It would seem to follow, therefore, that in passing upon the acts of assembly here involved, that the claim of the Commonwealth takes preference over the claim of the legatees named in the will because if the Commonwealth be held liable for the maintenance of this indigent daughter, the burden falls upon the taxpayers, which is a public interest, and then the legatees would be favored, which is a private interest, and this result would be diametrically opposed to the above quoted provision of the Statutory Construction Act.

In the case of Liberty Bank and Trust Company v. Commonwealth, 85 D. & C. 279, it is held that both provisions, namely, the Act of 1915 and The Mental Health Act were written for the benefit of the Commonwealth and that a relative named in the act is liable for the support of the relative inmate independently,

and in addition, to the possible liability of other persons named in the act.

We conclude that the estate of the father is absolutely liable for the balance due on account of the past maintenance of this daughter in a State institution, even though the Commonwealth during the years' inflation did not avail itself of a remedy it may have had under the Act of 1915, to have the contributions of the father increased during his lifetime. And we further conclude that the order made by the quarter sessions court at the time of commitment did not discharge the statutory obligation of the father imposed upon him by both the Act of 1915 and The Mental Health Act of 1923, as amended.

The auditor in filing his report did not state an account and there were certain expenses necessitated by having an audit in this case, and it appears that the executor of the estate should be authorized to pay these expenses, and as before noted, the court is of the opinion that the claim of the Commonwealth should be reduced by the amount above discussed and, therefore, we will make these allowances in the following

### Order

And now, to wit, November 15, 1957, the exceptions of the Commonwealth of Pennsylvania, Department of Revenue, filed to the report of the auditor disallowing the Commonwealth's claim are sustained and it is accordingly ordered and decreed that the executor of the estate of O. Zerbin Low shall pay from the funds in its hands the costs of the audit as follows: Thomas J. Evans, Esq., auditor's fee, $150; George J. Vanderslice, attorney for the executor, appearances before the auditor, submission of briefs to auditor, $50; The Argus, Benton, legal advertising, $11.70; Morning Press, Bloomsburg, $12.50 for legal advertising; to the Commonwealth of Pennsylvania for the unpaid balance

due on account of the costs of maintenance of Julia V. Low at the Pennhurst State School from October 2, 1920, until January 23, 1955, $6,612.52.

It is hereby further ordered that said executor shall pay the costs of these proceedings.

And now, to wit, November 15, 1957, upon motion of George J. Vanderslice, attorney for the executor, and upon motion of R. Eugene Eves, attorney for the legatees, exception noted and bill sealed.